UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

L.S., an individual,
Plaintiff,
v.
G6 HOSPITALITY, LLC;
G6 HOSPITALITY IP, LLC;
G6 HOSPITALITY PROPERTY, LLC;
G6 HOSPITALITY PURCHASING, LLC;
G6 HOSPITALITY FRANCHISING, LLC;
MOTEL 6 OPERATING, L.P.; and
CHOKKARAS, INC. d/b/a MOTEL 6 OMAHA,
Defendants.

Civil Action No.: _________________

JURY TRIAL DEMANDED

**PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff L.S., by and through the undersigned counsel, and respectfully submits her Complaint for damages and makes the following averments.

**INTRODUCTION**

1. This is a civil action for damages brought pursuant to the Federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 18 U.S.C. § 1595.

2. Plaintiff meets the definition of a sex trafficking victim as she was induced by force, fraud, and coercion to engage in commercial sex acts at the Motel 6 located at 10919 J Street, Omaha, Nebraska 68137 (the "Subject Hotel"), in 2016 and through and inclusive of 2021.

3. Defendants G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. (collectively, the "G6 Defendants" or "Franchisor Defendants") are the franchisors of the Motel 6 brand. Upon information and belief, they owned, operated or co-operated, controlled,

and/or managed the Motel 6 brand and the franchising system through which the Subject Hotel operated throughout the period during which Plaintiff was trafficked.

4. Defendant Chokkaras, Inc. (the "Franchisee Defendant") acquired the real property comprising the Subject Hotel by warranty deed on or about May 15, 2012, and upon information and belief has held record title to that property continuously thereafter, including throughout the entire period during which Plaintiff was trafficked. Upon information and belief, at all times relevant to this Complaint Franchisee Defendant owned, operated or co-operated, controlled, and/or managed the Motel 6 located in Omaha, Nebraska through the G6 franchising system.

5. The G6 Defendants are sued herein in their capacity as franchisor of the Subject Hotel and as participants in the ventures alleged below, and the allegations directed to them are directed to each of them throughout the entire period of Plaintiff's trafficking.

6. Section 1595 of the TVPRA provides for three distinct causes of action: (1) a claim against the trafficker who directly violated § 1591(a)(1), a criminal statute; (2) a beneficiary claim against the trafficker who directly violated § 1591(a)(2), a criminal statute; and (3) a beneficiary claim against a civil defendant benefiting from and receiving anything of value from participation in a venture which that person knew or should have known was engaged in sex trafficking. The subject lawsuit is applicable, in part, to prong three, i.e., a beneficiary claim against civil defendants.

**PARTIES**

7. Due to the sensitive, private, and potentially retaliatory nature of the allegations herein, Plaintiff proceeds by her initials to protect the privacy and identity of this subject sex trafficked victim. Nationwide similarly situated Plaintiffs have proceeded by pseudonym or by their initials due to the foregoing.

8. Plaintiff L.S. is a natural person born in 1987 and is a resident of the State of Iowa.

9. Defendant G6 Hospitality, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

10. Defendant G6 Hospitality IP, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

11. Defendant G6 Hospitality Property, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

12. Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

13. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

14. Defendant Motel 6 Operating, L.P. is a for-profit Delaware limited partnership with its principal place of business in Carrollton, Texas.

15. Defendant Chokkaras, Inc., doing business as Motel 6 Omaha, is, upon information and belief, a for-profit corporation organized under the laws of and operating within the State of Nebraska. Said Defendant acquired the real property comprising the Subject Hotel by warranty deed on or about May 15, 2012 from Neal Hospitality, Inc., took title under the name "CHOKKARAS INC," and upon information and belief has held record title continuously thereafter. Upon information and belief, said Defendant owned, operated, controlled, and/or managed the Subject Hotel located at 10919 J Street, Omaha, Nebraska through the G6 franchising system at all times relevant to this Complaint, including in 2016 and through and inclusive of 2021.

## JURISDICTION AND VENUE

16. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

17. This Court has personal jurisdiction over Franchisee Defendant. Franchisee Defendant purposefully availed itself of the privilege of conducting activities in Texas and in this District by soliciting and entering into a franchising relationship with the G6 Defendants in this District, by negotiating, executing, and performing the franchising agreements in this District, by directing payments, notices, reservations, reporting, and other required communications to the G6 Defendants in this District, and by agreeing to Texas law, to suit in this District, and to the waiver of objections to personal jurisdiction and venue here, all as further set forth in Paragraph 21 below and in particular Paragraph 21(a), (b), (c), (g), (n), and (q). Plaintiff's claims arise out of and relate to those contacts.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim — including the franchising venture between Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated, branded, and controlled — occurred, in substantial part, in Texas and in the Eastern District of Texas.

19. G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. have the same principal place of business, which is in Carrollton, Texas, within the Eastern District of Texas. Each of the G6 Defendants is therefore a resident of the Eastern District of Texas.

20. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(1). Each of the G6 Defendants maintains its principal place of business in the Eastern District of Texas and therefore resides in

this District. Franchisee Defendant is subject to this Court's personal jurisdiction with respect to this action and therefore likewise resides in this District pursuant to 28 U.S.C. § 1391(c)(2). All Defendants are accordingly residents of the State of Texas.

21. The franchising venture pursuant to which Franchisee Defendant operated the subject motel occurred, in substantial part, in Texas because:

(a) upon information and belief, Franchisee Defendant actively sought out a franchising relationship by contacting the G6 Defendants in Texas;

(b) on information and belief, Franchisee Defendant acknowledged that the negotiation, execution, and acceptance of the franchising agreements occurred in the Eastern District of Texas;

(c) on information and belief, Franchisee Defendant agreed that its ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas;

(d) on information and belief, the franchising agreements had a choice of law provision selecting the law of Texas as the governing law;

(e) on information and belief, the franchising agreements required Franchisee Defendant to report information to the G6 Defendants in Texas, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like L.S.;

(f) on information and belief, Franchisee Defendant agreed to submit all notices required under the franchising agreement to the G6 Defendants in the Eastern District of Texas;

(g) on information and belief, Franchisee Defendant was required to attend training and meetings in Texas;

(h) the G6 Defendants dictated policies related to safety, security, human trafficking, and hotel operations at the subject motel from their principal place of business in the Eastern District of Texas;

(i) on information and belief, Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the G6 Defendants from their principal place of business in the Eastern District of Texas;

(j) on information and belief, Franchisee Defendant was required to purchase insurance on behalf of one or more Texas entities (the G6 Defendants);

(k) upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by G6 from its principal place of business in Texas;

(l) upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by Franchisor in Texas;

(m) on information and belief, the benefit that Franchisee Defendant received from room rentals was governed by the Texas franchising agreement;

(n) on information and belief, Franchisee Defendant agreed to make all payments due under the franchising agreement at the G6 principal place of business in the Eastern District of Texas;

(o) the day-to-day operations of the subject motel were dictated, controlled, and influenced by many policies set and enforced by the G6 Defendants from their principal place of business in Carrollton, Texas;

(p) on information and belief, Franchisee Defendant signed a software licensing agreement with the G6 Defendants for the property management software the G6 Defendants required Franchisee Defendant to use when operating the subject motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms; and

(q) on information and belief, Franchisee Defendant agreed to file any lawsuit arising from the licensing agreement in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## FACTS

**I. L.S. was a Victim of Unlawful Sex Trafficking at the Subject Hotel Owned, Operated, Managed, and Controlled by Defendants.**

22. In 2016 and through and inclusive of 2021, Plaintiff L.S. was trafficked at the Subject Hotel by her trafficker. Under the control of her trafficker, L.S. was induced by force, fraud, and coercion to engage in commercial sex acts at the Subject Hotel.

23. Plaintiff was trafficked by her trafficker, a male individual known to Plaintiff as "Fletcher," who operated a commercial sex trafficking enterprise at the Subject Hotel.

24. In addition to sex trafficking, the trafficker possessed, supplied, and distributed controlled substances, including methamphetamine, on the subject premises and inside the rooms used for the trafficking of L.S.

25. In order to induce L.S. by force, fraud, and coercion to engage in sex with sex buyers at the Subject Hotel:

(a) the trafficker compelled L.S. to ingest methamphetamine, supplied her with that controlled substance, cultivated and sustained her dependence upon it, and

exploited that dependence as a means of coercion and control, including by withholding and threatening to withhold the substance upon which he had made her dependent;

(b) the trafficker physically abused, beat, and assaulted L.S., leaving visible bruising on her body which was readily observable by the staff of the Subject Hotel, and on one occasion at the Subject Hotel fracturing her arm;

(c) the trafficker seized and grabbed L.S. forcefully, on multiple occasions, in the lobby of the Subject Hotel, in the direct view of the staff of the Subject Hotel;

(d) the trafficker verbally abused, berated, and screamed at L.S., including inside the rooms used for her trafficking at the Subject Hotel, at a volume audible to persons outside those rooms;

(e) the trafficker advertised L.S. for commercial sex on internet platforms, including Backpage.com and at least one additional internet advertising platform, arranged and booked the commercial sex dates she was required to perform, and directed the sex buyers to whom she was required to submit; and

(f) the trafficker instilled in L.S. the fear that she would suffer serious harm if his demands were not complied with.

26. L.S. was compelled to engage in commercial sex acts with numerous sex buyers at the Subject Hotel.

27. At times when Plaintiff was trafficked at the Subject Hotel, two other women were trafficked alongside L.S. at the Subject Hotel by the same trafficker.

28. The rooms used for the trafficking of L.S. at the Subject Hotel were rented on a recurring basis, on repeated occasions in 2016 and through and inclusive of 2021.

29. The rooms used for the trafficking of L.S. at the Subject Hotel were registered at the front desk of the Subject Hotel in the name of L.S. herself, in the name of her trafficker, and in the name of one of the other women trafficked alongside her. The Subject Hotel therefore created and maintained guest registration records identifying by name the very persons who were being trafficked upon its premises, and the man who was trafficking them, over a period of approximately five years.

30. During the period she was trafficked at the Subject Hotel, L.S. at times met sex buyers outside the Subject Hotel and escorted them through the property and past the front desk to the rooms rented for her trafficking, in the view of the staff of the Subject Hotel. L.S. was dressed in scant and revealing clothing, including short dresses and heels, when she did so.

31. Sex buyers came and went from the rooms rented for the trafficking of L.S. frequently, and that steady foot traffic was observed by the staff of the Subject Hotel.

32. Staff of the Subject Hotel observed, or should have observed, visible bruising on L.S.'s body inflicted upon her by her trafficker, and were aware that her trafficker was violent.

33. Loud noises, screaming, and the sounds of physical fighting emanated frequently from the rooms used for the trafficking of L.S. at the Subject Hotel, and were audible to the staff of the Subject Hotel and to other guests.

34. The rooms used for the trafficking of L.S. at the Subject Hotel contained, and their waste receptacles contained, an inordinate number of condoms and condom wrappers, which were left about the rooms.

35. Housekeeping staff never entered the rooms used for the trafficking of L.S. over the course of the recurring and extended stays at the Subject Hotel, and those rooms accordingly went unserviced for the duration of those stays.

36. The physical, behavioral, and psychological effects of sex trafficking on its victims are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the Subject Hotel including effects on L.S.'s appearance, dress, demeanor, movements throughout the hotel, her visible bruising, her fractured arm, her visible emotional distress, her evident use of and dependence upon controlled substances, and her interactions with her trafficker, hotel staff, sex buyers, and others. Observing these effects provided Defendants with notice that L.S. was being continually subjected to coercion, control, and exploitation.

**II. Sex Trafficking in the Hotel Industry Is a Well-Known and Pervasive Problem.**

37. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendant knew or should have known regarding the trafficking at the Subject Hotel, including the trafficking of L.S.

38. The signs of sex trafficking in a hotel environment follow well-established patterns and can be detected by appropriately trained staff.

39. Numerous governmental agencies and non-governmental organizations engaged in combatting sex trafficking, including the United States Department of Homeland Security through its Blue Campaign, the National Center for Missing and Exploited Children, ECPAT, Love146, and the Office of the Attorney General of the State of Nebraska, have developed and published recommended policies, procedures, and training materials directed specifically to the hotel and lodging industry for the recognition of, and the response to, the signs of sex trafficking. Those materials were publicly available, and were available to Defendants, at all times relevant to this Complaint.

40. All Defendants were aware or should have been aware of recognized signs of sex trafficking when operating, controlling, and/or managing the Subject Hotel or the aspects of its

operation over which they respectively retained control, when enacting and enforcing policies and procedures applicable to the Subject Hotel and when training, educating, and supervising the staff of the Subject Hotel.

41. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to the signs of sex trafficking.

**III. Sex Trafficking Has Long Been Prevalent at G6 Branded Properties, and Defendants Have Known About It.**

42. Defendants have long been on notice of the pervasive problem of sex trafficking in the hotel industry. On information and belief, each of the Defendants has also long been on notice of sex trafficking occurring at Motel 6 properties including the Subject Hotel.

43. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los Angeles. G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

44. The settlement required the G6 Defendants to change policies that were facilitating sex trafficking. Based on information and belief, G6 has failed to adequately implement and enforce such changes.

**IV. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel.**

45. G6 Defendants were specifically aware that sex trafficking was widespread, in general, and knew, or should have known that same was occurring at the Subject Hotel during and prior to the time that Plaintiff was trafficked there.

46. Publicly posted guest reviews of the Subject Hotel, appearing on Google, described open commercial sex activity occurring at the Subject Hotel, including within the lobby of the Subject Hotel itself. The review set forth below was publicly posted on the internet, was publicly available thereafter throughout the period during which L.S. was trafficked at the Subject Hotel, and was posted during the period in which Franchisee Defendant was the record owner and operator of the Subject Hotel.

47. The G6 Defendants generate, receive, monitor, and analyze reports of guest complaints and of online reviews concerning their branded properties, including the Subject Hotel. Franchisee Defendant likewise monitored, or in the exercise of reasonable care would have monitored, the publicly posted reviews of the property it owned and operated.

48. The content of the review set forth below was therefore known to Defendants, or in the exercise of reasonable care would have been known to Defendants, during the period in which L.S. was trafficked at the Subject Hotel.

49. Those publicly posted reviews of the Subject Hotel include the following:

(a) A review posted to Google nine years prior to the filing of this Complaint, stating: "Oh boy. Where do I start. Mold growing in the bathroom. Got solicited by a prostitute (not even kidding) in the lobby."

(b) A review posted to Google eight years prior to the filing of this Complaint, rating the Subject Hotel one star out of five, stating: "Smoking pot all you could smell .. Front desk had friends and one a lady who look to be a hooker asking for use of our cell.. Not welcoming.. Not clean .. Wanted to leave the first 5 minutes there."

50. The review set forth at subparagraph (a) above does not merely describe the general character or condition of the Subject Hotel. A member of the public, writing publicly and unprompted on a platform that Defendants monitor and analyze, reported that he or she was solicited for commercial sex in the lobby of the Subject Hotel. The lobby is the one area of the property that is continuously staffed, occupied, and observed by the front desk personnel of the Subject Hotel, and, upon information and belief, is monitored by the surveillance cameras described below. Commercial sex solicitation occurring openly in that space could not have escaped the notice of a reasonably attentive staff. The publication of that report placed Defendants on notice that commercial sex activity was being conducted openly, and in the presence of their own personnel, at the Subject Hotel, and it called for investigation, training, supervision, and remedial action at the Subject Hotel that Defendants failed to undertake.

51. The review set forth at subparagraph (b) above is materially different in kind from a report of commercial sex activity occurring at a property. It reports that a woman whom the guest took to be engaged in commercial sex was in the company of the front desk of the Subject Hotel, among persons the guest described as the friends of the front desk, and approached the guest from that position. What that guest described, writing publicly and unprompted, was not commercial sex activity occurring despite the staff of the Subject Hotel, but commercial sex activity occurring in familiar association with the staff of the Subject Hotel, in the lobby, while that staff was on

duty. That is the same relationship between the staff of the Subject Hotel and the commercial sex activity conducted there that L.S. alleges herein.

52. Defendants publicly responded to the review set forth at subparagraph (b) above, on the same platform, in a response published under the identity of the owner of the Subject Hotel. In that response Defendants thanked the reviewer for the review, stated that "Safety and security are high priorities within Motel 6 standards for quality," apologized, characterized the conditions the reviewer described as an exception to the Motel 6 guest commitment, and directed the reviewer to contact a Motel 6 Guest Relations Department at a brand-wide toll-free telephone number in order to record the details of her visit.

53. That response establishes, on the face of the public record, that:

(a) the review was not merely available to Defendants but was actually received, read, and acted upon by them;

(b) Defendants maintained a centralized, brand-level Guest Relations Department to which guest reports concerning conditions at the Subject Hotel were routed and recorded, as further alleged below;

(c) the G6 Defendants set, held out to the public, and undertook responsibility for safety and security standards governing the operation of the Subject Hotel; and

(d) Defendants treated a public report of apparent commercial sex activity in familiar association with their own front desk staff as a customer service matter to be routed to a guest relations telephone line, rather than as a report of criminal activity at the Subject Hotel warranting investigation, retraining, supervision, discipline, or a report to law enforcement.

54. Notwithstanding their actual knowledge of the content of that review, Defendants did not undertake the investigation, training, supervision, or remedial action at the Subject Hotel that it called for, and the conditions the review described continued at the Subject Hotel throughout the period during which L.S. was trafficked there.

55. Defendants knew or should have known about the widespread trafficking at the Subject Hotel based on:

(a) upon information and belief, the obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

(b) that hotel staff observed the obvious signs of the trafficking of Plaintiff, including the visible bruising on her body, her fractured arm, the trafficker's forceful seizing of her in the hotel lobby, her passage through the property and past the front desk of the Subject Hotel in the company of sex buyers, in scant and revealing clothing, and her evident use of and dependence upon controlled substances;

(c) that the guest registration records of the Subject Hotel identified L.S. and her trafficker by name in connection with the rooms used for her trafficking, on a recurring basis over a period of approximately five years;

(d) that a member of the night desk staff of the Subject Hotel personally engaged in sex acts with L.S. on frequent occasions during the period she was trafficked there, and maintained a familiar relationship with her trafficker;

(e) that other women were being trafficked at the Subject Hotel alongside Plaintiff and by other traffickers during the same period;

(f) the loud noises, screaming, and sounds of physical fighting frequently emanating from the rooms used for the trafficking of Plaintiff; and

(g) the publicly posted reviews of the Subject Hotel described above, reporting that a member of the public was solicited for commercial sex in the lobby of the Subject Hotel and that a woman who appeared to be engaged in commercial sex was in familiar company with the front desk staff of the Subject Hotel, together with the public response that Defendants themselves published to the latter review.

**V. Defendants knew L.S. was being trafficked at the Subject Hotel because of the obvious signs of her trafficking.**

56. During the period that L.S. was trafficked at the Subject Hotel, there were signs obvious to hotel staff and management that she was being trafficked, including:

(a) Steady and frequent foot traffic of sex buyers to and from the rooms rented for the trafficking of L.S.;

(b) L.S. at times met sex buyers outside the Subject Hotel and escorted them through the property and past the front desk, in the direct view of hotel staff, while dressed in scant and revealing clothing, including short dresses and heels;

(c) The rooms used for the trafficking were booked by the trafficker, or at his direction, and were registered in the names of L.S. herself, of the trafficker, and of another woman trafficked alongside her, on a recurring basis over a period of approximately five years;

(d) L.S. was regularly seen by hotel staff in and about the Subject Hotel with visible bruising on her body;

(e) L.S. sustained a fractured arm at the hands of her trafficker while at the Subject Hotel;

(f) The trafficker seized and grabbed L.S. forcefully on multiple occasions in the lobby of the Subject Hotel, directly in front of hotel staff, and hotel staff knew the trafficker to be violent;

(g) Loud noises, screaming, and the sounds of physical fighting emanated frequently from the rooms used for the trafficking of L.S., audible to hotel staff and to other guests;

(h) Two other women were trafficked alongside L.S. at the Subject Hotel by the same trafficker, and other women were being trafficked at the Subject Hotel by other traffickers during the same period, in a manner observable to hotel staff;

(i) An inordinate number of condoms and condom wrappers were left about and in the waste receptacles of the rooms used for the trafficking;

(j) Housekeeping staff never entered the rooms used for the trafficking of L.S. over the course of recurring and extended stays;

(k) L.S. exhibited open and obvious signs of the use of and dependence upon controlled substances, which were observable to hotel staff;

(l) The trafficker possessed, supplied, and distributed methamphetamine on the subject premises and inside the rooms used for the trafficking, in a manner observable to hotel staff;

(m) The trafficking of L.S. at the Subject Hotel continued on a recurring basis over a period of approximately five years;

(n) A member of the night desk staff of the Subject Hotel personally engaged in sex acts with L.S. on frequent occasions and was on familiar terms with her trafficker; and

(o) Hotel staff observed the foregoing red flags, yet took no action to stop the trafficking, report it, or intervene.

57. Hotel staff and management observed, or should have observed, the foregoing obvious signs of sex trafficking including items set forth in the preceding paragraph.

58. When being trafficked at the Subject Hotel in 2016 and through and inclusive of 2021, L.S. was aware that staff of the Subject Hotel observed L.S., her trafficker, as well as sex buyers going in and out of the subject rented rooms, contemporaneous with other signs and indicators of trafficking occurring on the subject premises.

59. L.S. knows that some of the individuals that witnessed and observed red flags indicative of sex trafficking were staff members in that the staff were readily identifiable to L.S. either by her knowing of the individual and/or by means of the staff wardrobe/nametag/hotel logo and/or by means of a staff member being in an employee restricted area and/or by means of a staff member being stationed at the front desk of the Subject Hotel.

60. Based upon information and belief, multiple employees at the Subject Hotel, including management-level employees and front desk and housekeeping staff, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

61. Upon information and belief, the Subject Hotel was equipped with surveillance cameras positioned throughout the property, including in and about its lobby, corridors, entrances, walkways, and parking areas. Upon information and belief, the images captured by those cameras were displayed upon monitors located at the front desk of the Subject Hotel, which were monitored, or were required to be monitored, by the staff, management, and ownership of the Subject Hotel. The red flags of the trafficking of L.S. set forth above, including the steady foot traffic of sex buyers to and from the rooms rented for her trafficking, her passage through the

property and past the front desk in their company, and the trafficker's forceful seizing of her in the lobby, occurred within the view of those cameras.

62. As such, Defendants knew or should have known that L.S. was being trafficked at the Subject Hotel.

63. The foregoing red flags were not merely indicators of commercial sex activity but were indicators of sex trafficking specifically because they included observable signs of force, coercion, and control over L.S. — including the visible bruising on her body, the arm fractured at the hands of her trafficker while at the Subject Hotel, the trafficker's repeated forceful seizing of her in the hotel lobby in front of staff, the screaming and sounds of fighting audible from her rooms, his open supply and distribution of methamphetamine on the premises together with L.S.'s visible dependence upon that substance, the presence of two other women trafficked alongside her by the same man, and L.S.'s escorting of sex buyers through the hotel's public areas rather than her own free and independent use of the premises as a guest. These signs, individually and collectively, provided Defendants with notice not only of sex trafficking activity generally at the Subject Hotel, but specifically that L.S. was being subjected to trafficking through force, fraud, and coercion.

**VI. Defendants actively facilitated sex trafficking at the Subject Hotel, including the trafficking of L.S.**

64. Defendants had both actual and constructive knowledge of the trafficking of L.S. at the Subject Hotel because the trafficking was, in part, a consequence of Defendants facilitating her trafficking at the Subject Hotel.

65. The rooms used for the trafficking of L.S. were rented and/or renewed by the trafficker, or at the direction of the trafficker, on a repeated, recurring basis in 2016 and through and inclusive of 2021.

66. Defendants rented rooms to individuals it knew or should have known were engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

67. Franchisee Defendant, through its staff, rented rooms used for the trafficking of L.S., collected payment for those rooms, registered L.S. and her trafficker by name as the occupants of those rooms, and interacted face-to-face with L.S. and her trafficker on a regular and repeated basis. These were not passive observations of trafficking from a distance; Franchisee Defendant was involved in the commercial transactions that provided the venue for the trafficking of L.S.

68. Defendants knowingly benefited from the sex trafficking of Plaintiff at the subject hotel by receiving payment for the rooms rented that were used for sex trafficking, including as to the Plaintiff, in violation of the TVPRA in 2016 and through and inclusive of 2021.

69. The rooms at the subject hotel that were used for the sex trafficking of the Plaintiff were booked by the trafficker or at his direction. Discovery will reveal additional facts concerning the manner in which the trafficker and those acting at his direction booked rooms at the subject hotel that were used for the sex trafficking of the Plaintiff in violation of the TVPRA:

(a) the guest registration records maintained by Defendants for each such booking and renewal, including the names under which the rooms were registered;

(b) the identification, if any, that staff of Defendants required at the time of each booking or renewal; and

(c) the records maintained by Defendants of the method and form of payment for the rooms so rented.

70. Defendants allowed the trafficker and those acting at his direction on the subject premises to continue to pay for rooms rented at the subject hotel during the time that Plaintiff was being sex trafficked there in violation of the TVPRA.

71. Franchisee Defendant was the record owner of the real property comprising the Subject Hotel continuously from on or about May 15, 2012, and was the owner and operator of the Subject Hotel throughout the entire period of L.S.'s trafficking. Accordingly, the allegations of this Complaint directed to the owner and operator of the Subject Hotel are directed to Franchisee Defendant throughout that entire period. The allegations directed to the G6 Defendants in their capacity as franchisor of the Subject Hotel are directed to those Defendants throughout that same period.

72. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking in general and, on information and belief, at the Subject Hotel, Franchisee Defendant continued renting rooms used to sexually exploit Plaintiff.

73. Franchisee Defendant knew or should have known that L.S. was being trafficked and, despite this, benefited from continued association with her trafficker by providing a venue for her exploitation.

74. Franchisee Defendant also facilitated trafficking at the Subject Hotel, including the trafficking of L.S., in ways including:

(a) allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

(b) inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

(c) on information and belief, choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures, notwithstanding the obvious red flags of the trafficking of L.S. observable to its staff;

(d) employing, retaining, and failing to supervise a member of the night desk staff who personally engaged in sex acts with L.S. on frequent occasions and who was on familiar terms with her trafficker;

(e) renting rooms on a recurring basis, over a period of approximately five years, registered in the names of a woman being trafficked upon its premises and of the man trafficking her, without inquiry, scrutiny, or intervention;

(f) permitting other traffickers to operate at the Subject Hotel during the same period; and

(g) creating an environment where the trafficker did not need to incur the burden of taking significant steps to conceal his activities but, instead, could operate openly — including physically abusing L.S. so as to leave bruising visible to hotel staff and fracturing her arm on the premises, seizing her forcefully in the hotel lobby in front of staff, screaming at her audibly from the rooms, openly supplying and distributing controlled substances on the premises, and escorting sex buyers through the property and past its front desk — without concern for detection or interference by the hotel staff.

75. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of L.S.

76. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel, G6 continued to control, participate in, and derive revenue from the rental of rooms at the Subject Hotel, including the rooms used to sexually exploit victims, including L.S.

77. G6 knew or should have known that L.S. was being trafficked and, despite this, benefited from continued association with her trafficker by providing hotel rooms and related services used for her exploitation.

78. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Hotel, the G6 Defendants continued participating in a venture at the Subject Hotel, with Franchisee Defendant and hotel staff, in a way that they knew or should have known would lead to additional sex trafficking, including but not limited to by the following:

(a) the G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

(b) the G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

(c) the G6 Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties;

(d) the G6 Defendants failed to ensure that franchisees and hotel staff reported or responded to criminal activity including sex trafficking appropriately;

(e) the G6 Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at G6 branded properties, including the Subject Hotel;

(f) the G6 Defendants attracted traffickers by maintaining a venue where access was easy, risks of interference were low, and traceability was minimal; and

(g) the G6 Defendants allowed traffickers to reserve and pay for rooms on a short-term, day-by-day or night-by-night basis, which provided relative anonymity and non-traceability.

79. If G6 had exercised reasonable diligence in the areas of the operation of the Subject Hotel over which it retained control, G6 would have prevented the Subject Hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of L.S. Instead, G6 engaged in a course of conduct that facilitated widespread and ongoing sex trafficking, including the trafficking of L.S.

**VII. Defendants knowingly benefited from participation in a venture that they knew or should have known was engaged in sex trafficking.**

80. Through the conduct described above, Defendants knowingly benefited from engaging in a venture with the trafficker and with one another.

81. The repeated rental transactions between the trafficker (and those acting at his direction) and the Subject Hotel which occurred during the time that Plaintiff was trafficked at the subject hotel were colored by overt indicators of sex trafficking — including the steady foot traffic of sex buyers to and from the rooms, L.S.'s passage through the property in the company of sex buyers in scant and revealing clothing, the visible bruising on her body, the arm fractured on the premises, the trafficker's repeated forceful seizing of her in the lobby in front of staff, the screaming and sounds of fighting audible from the rooms, the registration of the rooms in the names of L.S. and of her trafficker on a recurring basis over approximately five years, the complete absence of housekeeping entry over extended stays, an inordinate number of condoms and condom wrappers left about the rooms, the presence of other women being trafficked at the property, the participation of a member of the hotel's own night desk staff in sex acts with L.S., and the open

supply and distribution of methamphetamine on the premises — such that said Defendants knew, or should have known, that they were renting rooms to, and facilitating, individuals engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

82. A venture existed between the trafficker and Franchisee Defendant at the subject hotel premises by means of rooms repeatedly rented for the trafficking, which rooms Defendants knew, or should have known, were being used for the sex trafficking of Plaintiff in violation of the TVPRA, and which the parties wished to continue for profit.

83. A venture also existed between Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated, branded, and controlled.

84. Relative to the subject hotel, a continuous business relationship existed between Franchisee Defendant and the trafficker's sex trafficking business, in part, in that Defendant provided assistance, support, or facilitation to the trafficker and individuals it knew or should have known were involved in sex trafficking on the premises, in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the trafficking venture's success.

85. Relative to the subject hotel, a continuous business relationship existed between Franchisor Defendants and the trafficker's sex trafficking business, in part, in that said Defendants provided assistance, support, or facilitation to the trafficker and individuals they knew or should have known were involved in sex trafficking on the premises in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the trafficking venture's success.

86. Through the conduct described above, each Defendant also knowingly benefited from engaging in a commercial venture with other Defendants operating the Subject Hotel. Defendants associated with one another and with the hotel staff to operate the Subject Hotel. Each Defendant received financial benefits from operating the Subject Hotel, including revenue generated

specifically by renting rooms used for the trafficking. They engaged in revenue sharing and had a common incentive to maximize revenue. Upon information and belief, pursuant to the franchising agreement, Franchisee Defendant was required to remit to the G6 Defendants a percentage of the gross room revenue generated at the Subject Hotel, together with additional fees calculated upon that revenue. The G6 Defendants therefore received a direct financial benefit from each room rented at the Subject Hotel, including each room rented for the trafficking of L.S.

**VIII. Franchisee Defendant and the Staff at the Subject Hotel Acted as Actual Agents of G6.**

87. G6 is vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant and the staff of the Subject Hotel.

88. The G6 Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Hotel through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the G6 Defendants.

89. Upon information and belief, and consistent with the standard practice of the hospitality industry, the G6 Defendants set exacting brand standards governing the operation of the Subject Hotel, reaching such matters as the temperature at which coffee is to be served, the number of pillows to be placed upon the beds, the forms of payment to be accepted, and when, where, and how guests are to be greeted. The G6 Defendants further supplied the signage displayed on and in front of the building and required the Motel 6 brand and marks to be displayed throughout the property, including upon the stationery placed in the guest rooms and upon the uniforms worn by the staff stationed at the front desk, so that a guest arriving at the Subject Hotel would expect an experience consistent with the standards of the Motel 6 brand. The average guest does not perceive the relationship between franchisor and franchisee. The brand supplies the property its identity,

and the G6 Defendants hold themselves out to the public as the owners and operators of the Subject Hotel. The right of the G6 Defendants to enforce their brand standards, including their safety and security standards, was not merely their right but their responsibility.

90. The G6 Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the G6 Defendants imposed on the Franchisee Defendant:

(a) did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Hotel;

(b) covered virtually all aspects of hotel operations, including internal operating functions;

(c) dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Hotel; and

(d) significantly exceeded what was necessary for G6 to protect its registered trademarks.

91. In addition to the foregoing, upon information and belief, G6 exercised and reserved the right to exercise control over the day-to-day operation of the Subject Hotel, including:

(a) requiring franchisees and management to participate in mandatory training programs covering all aspects of hotel operations;

(b) controlling training content and methods for hotel staff;

(c) designating approved vendors and prohibiting purchases from non-approved sources;

(d) requiring use of specific technology, hardware, software, and property management systems;

(e) setting required staffing levels;

(f) establishing detailed job descriptions and dictating which positions must perform which tasks;

(g) setting requirements for hiring, overseeing discipline, and termination decisions;

(h) controlling channels for guest complaints and directly participating in responses;

(i) generating reports and analysis of guest complaints and online reviews;

(j) requiring use of a Guest Relations Application owned and operated by G6;

(k) regularly auditing books and records;

(l) conducting frequent and unscheduled inspections;

(m) retaining the right to issue fines, require corrective action plans, and terminate franchising agreements;

(n) controlling all marketing and prohibiting unauthorized online presence;

(o) imposing detailed recordkeeping and reporting requirements regarding virtually all aspects of hotel operations;

(p) requiring all hotel staff to complete training created, controlled, and maintained by the G6 Defendants through an online learning platform that the G6 Defendants owned and operated, and retaining sole discretion to determine whether such training had been satisfactorily completed;

(q) providing benefits for the employees of the Subject Hotel;

(r) requiring the use of a customer relationship management program maintained and operated by the G6 Defendants; and

(s) requiring that the property management system in use at the Subject Hotel be linked to the corporate network and data center of the G6 Defendants, through which room

reservations were received and payment transactions for those rooms were processed.

92. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred, including:

(a) publicly assuming responsibility and control over the human trafficking response of all Motel 6 and Studio 6 properties;

(b) retaining control over when its branded hotels would share information with law enforcement and over when law enforcement would be contacted about suspected criminal activity at its branded hotels;

(c) creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking and determining when issues should be escalated;

(d) retaining control over determining which hotels needed additional training based on high risk of trafficking;

(e) retaining control to terminate staff or franchising agreements based on the response to human trafficking;

(f) retaining control over all training on how to spot and prevent human trafficking;

(g) maintaining a Safety & Security Team and Critical Incident Rapid Response Team for investigating potential criminal incidents;

(h) adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking;

(i) setting, supervising, and enforcing detailed policies and protocols for housekeeping services at the Subject Hotel, including how frequently guest rooms were required

to be entered, how staff were required to respond when a guest declined entry to a room, and the steps by which guest safety issues were to be monitored through housekeeping services; and

(j) collecting, maintaining, and analyzing detailed data regarding housekeeping services at the Subject Hotel, including data that would reveal patterns consistent with human trafficking.

93. G6 directly participated in and retained day-to-day control over renting rooms at the Subject Hotel by, among other things:

(a) controlling all details of the guest reservation, check-in, and payment processes;

(b) directly making reservations and accepting payment through a central reservation system without requiring franchisee approval;

(c) establishing and maintaining a brand-wide guest rewards and loyalty program;

(d) controlling room rates, required discounts, mandatory fees, and rewards programs;

(e) controlling and restricting the ability of franchisees and staff to refuse or cancel a reservation;

(f) establishing detailed policies and protocols dictating, step by step, everything that occurred from the time a guest arrived at the Subject Hotel until the guest entered a guest room, including required payment methods, identification requirements, the number of guests permitted in each room and whether information was to be collected for each guest, and what questions hotel staff were and were not to ask;

(g) collecting, retaining, monitoring, and analyzing detailed data about every guest;

(h) exercising and retaining the right to exercise control over virtually all aspects of room reservations and payment;

(i) establishing and maintaining a brand-wide "do not rent" system, setting all policies governing the use of that system, and dictating the day-to-day details of reservations at the Subject Hotel through those policies; and

(j) listing the Subject Hotel in the Global Distribution System and in other online travel agency databases, maintaining brand-wide toll-free reservation telephone numbers through which rooms at the Subject Hotel were booked, and supplying and controlling the revenue management tools used at the Subject Hotel.

**IX. G6 Defendants are jointly responsible for the trafficking of L.S.**

94. All the G6 Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

95. Upon information and belief, operation of the Subject Hotel was part of a single unified operation by G6 Defendants. Upon information and belief, all G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, the G6 Defendants and Franchisee Defendant were likewise participants in a joint venture with one another in the operation of the Subject Hotel, which involved a common enterprise, the sharing of the revenue and profits generated by the Subject Hotel, a community of interests, and joint rights of control and management over its operation, and each is therefore vicariously liable for the violations of the other.

**X. Causation.**

96. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to L.S.

97. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to L.S. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

**CAUSES OF ACTION — SEX TRAFFICKING UNDER THE TVPRA**

98. L.S. incorporates all other allegations.

**COUNT I. Cause of Action: Beneficiary Liability under § 1595(a) of the TVPRA (all Defendants)**

99. L.S. is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is entitled to bring a civil action against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

100. Through acts and omissions, and participation, described throughout this Complaint, Defendants received a financial benefit from participating in a venture with traffickers, including L.S.'s trafficker, even though Defendants knew or should have known that this trafficker was engaged in violations of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2). Thus, Defendants are liable as a beneficiary under 18 U.S.C. § 1595(a).

101. Through the acts and omissions described throughout this Complaint, G6 Defendants received a financial benefit from participating in a venture with Franchisee Defendant regarding the operations of the Subject Hotel even though G6 Defendants knew or should have known that this venture was violating 18 U.S.C. §§ 1591(a) and 1595(a).

102. Defendants' participation in these ventures combined with the trafficker's conduct, and the other unlawful acts and omissions alleged in this Complaint, to cause L.S. to suffer

substantial physical and psychological injuries and other damages because of being trafficked at the Subject Hotel.

**COUNT II. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants)**

103. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

104. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

105. Franchisee Defendant acted as the actual agent of G6 Defendants when operating the Subject Hotel.

106. Through the acts and omissions described throughout this Complaint, G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendant to operate the Subject Hotel.

107. G6 Defendants are vicariously liable for the TVPRA violations of Franchisee Defendant and the subagents of that franchisee, including the members of the staff of the Subject Hotel.

## DAMAGES

108. As a direct and proximate result of Defendants' conduct, L.S. has suffered and will continue to suffer substantial damages.

109. Defendants' involvement and failure to timely and properly prevent the sex trafficking or timely intervene regarding same was a proximate cause of the injuries and damages sustained by L.S. in this case including, but not limited to, being the victim of sex trafficking when at the Subject Hotel and suffering personal injury and the trauma physically and mentally of being induced to engage in commercial sex with numerous sex buyers while being trafficked, and while

simultaneously being under fear of harm if she did not comply, being subjected to repeated physical abuse and violence — including beatings leaving visible bruising and a fracture of her arm sustained at the Subject Hotel — being subjected to sustained verbal abuse and degradation, being compelled to ingest methamphetamine and kept dependent upon that controlled substance by her trafficker as a means of coercion and control, as well as all residual injuries suffered by PTSD.

110. L.S. being sex trafficked at the Subject Hotel was a proximate cause, competent cause, and substantial factor in causing her severe and permanent injuries including but not limited to personal injuries including the horror of being a victim of sex trafficking as well as significant levels of psychological trauma due to the levels of abuse she was caused to endure during the time she was trafficked. This trauma led to depression, anxiety disorders, substance use disorder, and PTSD, which in turn affects daily functioning.

111. As a consequence of being sex trafficked at the Subject Hotel, L.S. suffered and will continue to suffer substantial economic, physical, mental, emotional, psychiatric, and psychological injuries as the result of being trafficked and sexually exploited at the Subject Hotel in violation of 18 U.S.C. § 1591.

**TOLLING OF LIMITATIONS**

112. Plaintiff was under the control, coercion, and manipulation of her trafficker in 2016 and through and inclusive of 2021, and as a result, Plaintiff lacked the information and capacity to understand her injuries and their legal causes.

113. Thus, Plaintiff did not discover and could not reasonably have discovered the legal cause of her injury — through no fault of her own — and lacked the information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of

information was a direct result of Plaintiff being kept under the control, coercion, and manipulation of her trafficker, which Defendants facilitated.

114. At the time Plaintiff was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked" at the Subject Hotel, or that she was a person "trafficked," much less that she was the "victim" of a venture involving Defendants, and she did not discover and was not in a position to discover the legal cause of her injury for years after her trafficking ended.

115. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Plaintiff faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than ten years before Plaintiff filed this lawsuit.

116. While under the control of her trafficker in 2016 and through and inclusive of 2021, Plaintiff did not have the freedom to investigate her claims, to identify those responsible, or to seek the legal representation necessary to pursue her legal rights. Plaintiff could not have pursued her claims while under the active control of her trafficker despite the exercise of ordinary diligence.

117. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants.

118. Plaintiff was subject to continuous trafficking at the Subject Hotel in 2016 and through and inclusive of 2021, which is not more than ten years before Plaintiff brings this lawsuit.

119. This continuous trafficking resulted from Defendants' facilitation of trafficking at the Subject Hotel as described above.

120. The TVPRA's ten-year limitations period, 18 U.S.C. § 1595(c), is subject to equitable tolling. See Arellano v. McDonough, 598 U.S. 1, 6–7 (2023), in which the Court emphasized the "hornbook law" presumption that federal statutes of limitations are subject to tolling unless Congress clearly states otherwise. See also Doe v. G6 Hospitality Franchising LLC et al., No. 3:2025-cv-00770 — Document 53 (N.D. Tex. 2025).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as identified in the above-referenced Counts and as follows:

(a) All available compensatory damages for the described losses with respect to the above cause of action;

(b) Past and future emotional distress;

(c) Consequential and/or special damages;

(d) All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

(e) Physical pain and suffering;

(f) Lost earnings and loss of earning capacity, past and future;

(g) Necessary past and future medical expenses;

(h) Life care expenses;

(i) Physical impairment;

(j) Disgorgement of profits obtained through unjust enrichment;

(k) Restitution;

(l) All damages allowable under the TVPRA;

(m) Attorneys' fees as allowed by law;

(n) Punitive damages with respect to each cause of action;

(o) Costs of this action;

(p) Prejudgment and all other interest recoverable; and

(q) Such other and further relief to which L.S. may, in law or in equity, show herself to be justly entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: July 29, 2026

Respectfully submitted,

/s/ Jason Byrd
Jason Byrd
448 Orleans
Beaumont, TX 77701
Telephone: (409) 924-0660
Facsimile: (409) 924-0035
jason@txbyrd.com

Randolph D. Janis, Esq.
DOUGLAS & LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
rjanis@douglasandlondon.com

Chloe Makowsky, Esq.
DOUGLAS & LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
cmakowsky@douglasandlondon.com

Attorneys for Plaintiff